UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE PROFESSIONALS ASSOCIATION TEAMSTERS LOCAL UNION NO. 1224, and TEAMSTERS LOCAL UNION NO. 357, <br><br>       Plaintiffs,<br><br>v.<br><br>REPUBLIC AIRWAYS, INC., REPUBLIC AIRWAYS HOLDINGS, INC., and HYANNIS AIR SERVICE, INC.,<br><br>       Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )    No. 1:23-cv-00995-RLY-MG |

**ENTRY ON DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendants, Republic Airways, Inc. and Hyannis Air Service, Inc. (or "Carriers"), require pilot candidates to execute individual pre-hire agreements. The agreements generally provide that upon successfully upgrading to the position of Captain and agreeing to remain employed with the Carriers for a specific period of time, those pilots will receive substantial bonuses (also referred to by the Carriers as incentive payments); however, if they fail to fulfill their obligations under the agreements, they must pay the bonuses back, pay liquidated damages, and be subject to post-employment restrictions. Plaintiffs, the International Brotherhood of Teamsters ("IBT") and two of its local unions, maintain the Carriers' actions violate the Railroad Labor Act, 45 U.S.C. §§ 151 *et seq.*

1

("RLA") and Indiana state law. Defendants now move to dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. For the reasons set forth below, the court **GRANTS** Defendants' motion to dismiss for lack of subject matter jurisdiction.

**I.    Background**

**A.    Parties**

Republic is a wholly owned subsidiary of Republic Airways Holdings Inc. (Filing No. 20, First Am. Compl. ("FAC") ¶ 9). Republic, headquartered in Indianapolis, Indiana, provides regional passenger air service to American Airlines, Delta Air Lines, and United Airlines. (*Id*. ¶¶ 8, 12). Republic currently employs approximately 2,000 pilots. (*Id*. ¶ 13). Hyannis Air is also a regional air carrier, of which Republic Airways Holdings Inc. owns an approximate 40% shareholder interest. (*Id*. ¶ 11). Hyannis Air currently employs approximately 167 pilots. (*Id*. ¶ 17).

Plaintiff IBT is an unincorporated labor organization with its principal offices in Washington, D.C. (*Id*. ¶ 5). IBT is the collective bargaining representative certified by the National Mediation Board ("NMB") as the exclusive representative of pilots employed by Republic, and pilots employed by Hyannis Air. (*Id*.). Plaintiff Teamsters Local Union No. 357 is designated by the IBT to act as its local agent for pilots employed by Republic. (*Id*. ¶ 6). Plaintiff Airline Professionals Association, Teamsters Local Union No. 1224, is designated by the IBT to act as its local agent for pilots employed by Hyannis Air. (*Id*. ¶ 7).

### B.     The Republic-IBT Collective Bargaining Agreement

Republic and IBT are parties to a collective bargaining agreement ("CBA") dated October 14, 2022.  (*Id*. ¶¶ 14-15; *see generally* Filing No. 25-2, Republic-IBT CBA).  As relevant here, Article 3.O. of the Republic-IBT CBA, titled "Signing Bonuses, New Hire Incentives, and Other Bonuses/Incentives," grants Republic the discretion to offer "signing bonuses, stipends, and/or incentives in its recruitment efforts of New Hire Pilots" as well as the "discretion to determine the terms of the signing bonus, stipend, and/or other incentives for New Hire Pilots."  (Republic-IBT CBA, Art. 3.O.1. at 3-7).  Article 3.O.3 grants Republic the discretion to "offer a bonus or other financial incentive at any time and of any type or form to incentivize a qualified Pilot to complete Captain qualification training" as well as "the discretion to determine the terms of the bonuses, or other incentives for Pilots, including but not limited to the timing of payments of such bonuses and/or incentives."  (*Id.*, Art. 3.O.3 at 3-7).

### C.     The Hyannis Air-IBT Collective Bargaining Agreement

Hyannis Air and IBT are parties to a separate CBA dated April 1, 2020.  (FAC ¶ 18; *see generally* Filing No. 25-7, Hyannis Air-IBT CBA).  Section 1.J. of the Hyannis Air-IBT CBA, entitled Management Rights, provides that the Company has the right "to exercise all rights or functions of management except to the extent that such rights of management are limited by this Agreement and so long as the exercise of such rights does not conflict with the terms of this Agreement."  (Hyannis Air-IBT CBA §1.J at 11).

The CBA does not contain any provision permitting the Carrier to pay bonuses to pilots.  (FAC ¶ 41).

### D. Employment Incentive Agreements at Republic and Hyannis Air

#### 1. Republic Airways New First Officer Career Advancement Program

Republic offers individual pilot candidates the Republic Airways New First Officer Career Advancement Program ("Career Advancement Program"), the terms and conditions of which are provided in the Career Advancement Program Pre-Hire Enrollment Agreement ("Republic Agreement"). (*See generally* Filing No. 20-3, Republic Pre-Hire Agreement).

In the Republic Agreement, Republic and individual pilot candidates agree that the pilot candidate will be eligible for an incentive payment of $100,000, to be paid in installments according to the payment schedule and terms and conditions therein, beginning with a first installment of $25,000 upon the pilot candidate's successful completion of First Officer training, a second installment of $50,000 upon the pilot candidate's successful completion of Captain upgrade training, and a third installment of $25,000 after successfully completing one year of active service as a Captain. (*Id*. at 2 ¶ II.A). In exchange, pursuant to the terms of the agreement, the pilot candidate agrees to make a two-year employment commitment as an active status Captain at Republic. (*Id*. at 3–4 ¶¶ II.C., III.A, C). In the event the pilot candidate is downgraded from the position of Captain, the pilot candidate agrees to make a five-year commitment as an active status pilot for Republic and becomes ineligible for any remaining incentive payments. (*Id*. at 3–4 ¶¶ II.C, III.C).

The pilot candidate agrees that failure to comply with the employment commitment constitutes a material breach of the Republic Agreement, requiring the candidate to repay the incentive payment.  (*Id.* at 4 ¶ III.B, C).  Additionally, the pilot candidate must also pay damages, "not as a penalty, but as liquidated damages representing the harm to Republic based on the cost of training," the amount of which depends on how much of their employment commitment period they have completed, up to $100,000.  (*Id.* at 4 ¶ III.C).  In the event the pilot candidate resigns from employment with Republic or is terminated in accordance with the Republic-IBT CBA prior to fulfilling the specified employment commitment, the pilot candidate warrants that for a period of one year, he will not work as a pilot for an airline other than American Airlines, Delta Air Lines, or United Airlines mainline operations.  (*Id*. at 5 ¶ III.G).

### 2. Republic Airways Captain Pathway Program

Republic also offers the Republic Airways Captain Pathway Program based on the terms and conditions of the Republic Airways Captain Pathway Program Enrollment Agreement (the "Pathway Agreement"), which is a three-party agreement between a pilot candidate, Hyannis Air, and Republic.  (*See generally* Filing No. 20-1, Pathway Program Pre-Hire Agreement).  In the Pathway Agreement, the individual pilot candidate is hired by Hyannis Air and receives a $2,500 signing bonus paid by Republic.  (*Id*. at 1 ¶ I).  The parties agree that upon performing at least 720 hours of qualifying "Pilot in Command" (or "PIC") time at Hyannis Air, the pilot candidate will receive a guaranteed First Officer Trainee class date at Republic.  (*Id*. at 2 ¶ II).  Upon successfully upgrading to the

position of Captain at Republic, the pilot candidate is eligible for an incentive payment of up to $100,000.  (*Id*. at 2 ¶ III).

The amount of the incentive payment from Republic depends on the number of months in which the pilot candidate completes the required 720 PIC flight hours and the number of months in which the pilot candidate upgrades to Captain at Republic.[1]  (*Id*. at 2–3 ¶ III).  In exchange for the incentive payment, the pilot candidate agrees to a three-year employment commitment, which includes the 720 hours of qualifying PIC time at Hyannis Air, with the remainder of that commitment at Republic.  (*Id*. at 3 ¶ IV).  This three-year employment commitment also specifically includes a two-year commitment as a Captain at Republic.  (*Id*.).

The pilot candidate agrees that failure to satisfy the agreed employment commitment shall constitute a material breach of the Pathway Agreement, requiring the pilot to repay the incentive payments made and pay the sum of $250,000 in liquidated damages (again, "not as a penalty") to Republic.  (*Id*. at 4 ¶ IV).  The pilot further agrees that in the event the pilot is terminated or terminates from employment at Republic, the pilot will not work as a pilot for another airline that is in competition with Republic for one year.  (*Id*.).

### E. IBT's 2023 Grievances Over Pre-Hire Employment Incentives

In May 2023, the IBT filed grievances alleging that the pre-hire employment

---

[1] For example, if the pilot successfully completes 720 PIC flight hours in seven or less months, and if the pilot upgrades to Captain at Republic in one or two months, the pilot will receive 100% of the upgrade bonus eligible amount, or $100,000. (Pathway Program Pre-Hire Agreement at 2–3).

incentives offered by Republic and Hyannis Air violate various provisions of their CBAs.[2] (Filing No. 25-4, IBT-Republic Grievance; Filing No. 25-8, IBT-Hyannis Air Grievance). After Plaintiffs filed their grievances, they filed the instant lawsuit on June 8, 2023. (Filing No. 1). In their First Amended Complaint, Plaintiffs bring the following causes of action under the RLA: a claim under Section 2, Third and Fourth for interference with representation rights (Count I); a claim under Section 2, Ninth for failure to negotiate or otherwise deal with the certified bargaining representative regarding the terms and conditions of the pilots' employment (Count II); and a claim under Section 2, First, Seventh and Section 6 for improperly altering the parties' status quo without negotiation (Count III). Plaintiffs also raise a state law claim alleging that the post-employment non-compete provisions in the pre-hire employment incentive agreements violate Indiana law on restrictive covenants (Count IV).

## II.   Dismissal Standard

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of any claim over which the federal court lacks subject matter jurisdiction. A defendant makes a facial attack on subject matter jurisdiction when it asserts that the plaintiff's allegations, taken as true, do not support an inference that subject matter jurisdiction exists. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). Facial challenges require a court to "look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction," whereas factual challenges refute the existence of jurisdiction

---

[2] The grievances were filed to toll contractual time limits.

notwithstanding a complaint's allegations. *Apex Digit., Inc. v. Sears Roebuck & Co.*, 572 F.3d 440, 443–44 (7th Cir. 2009). For factual challenges, a court may look beyond a complaint's allegations and, if a defendant presents evidence that calls into question a court's jurisdiction, then the "presumption of correctness that we accord to a complaint's allegations falls away," and plaintiff bears the burden to present evidence that a court has subject-matter jurisdiction. *Id.* (quoting *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 685 (7th Cir. 1998)).

The Carriers' standard of review tracks the language of a factual challenge, but because they rely only on the parties' collective bargaining agreements, the court treats this motion as a facial challenge.

### III. Discussion

#### A. The Railroad Labor Act

The purpose of the Railway Labor Act is, among other things, "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein," and "to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions." *United Air Lines, Inc. v. Int'l Ass'n of Machinist & Aerospace Workers*, 243 F.3d 349, 361 (7th Cir. 2001) (quoting 45 U.S.C. § 151a). The intent of the RLA is to encourage collective bargaining by the parties to avoid strikes and interruptions in interstate commerce. *Id.* In 1936, Congress extended the RLA to cover the airline industry. *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 248 (1994).

The RLA provides two distinct procedures for dispute resolution, each of which depends on whether the dispute is "major" or "minor." *Burlington N. R.R. Co. v. United*

8

*Transp. Union*, 862 F.2d 1266, 1271 (7th Cir. 1988).  The resulting categorization determines whether the court has subject matter jurisdiction over the dispute: yes, if major; no, if minor.  *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n*, 491 U.S. 299, 303 (1989).

The statutory bases for major disputes are 45 U.S.C. § 152 Seventh and § 156.  *Id.* at 302.  Section 152 Seventh provides that no carrier "shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title."  *Id.* (quoting 45 U.S.C. § 152 Seventh).  According to the Supreme Court, a major dispute:

> relates to . . . the formation of collective agreements or efforts to secure them.  They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy.

*Elgin, J. & E.R. Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also Bhd. of Locomotive Eng'rs & Trainmen v. Union Pac. R.R. Co.*, 879 F.3d 754, 757 (7th Cir. 2017) ("[M]ajor disputes pertain to the creation of new contracts affecting any mandatory subject of bargaining or modifications of existing contracts that have the same effect.").  Where major disputes are involved, the RLA requires the parties to exhaust a lengthy bargaining and mediation process.  *Consol. Rail*, 491 U.S. at 302.  The parties are obligated to maintain the status quo during the process.  *Id.*  The district court has subject matter jurisdiction to enjoin a violation of the status quo.  *Id.* at 303.  If no agreement is reached, the parties may resort to economic force, including strikes.  *Id.*

Minor disputes, on the other hand, "aris[e] out of the grievances or out of the interpretation or application of agreements concerning rates of pay, rules or working conditions." 45 U.S.C. § 152 Sixth. If discussions fail to yield a solution, both parties are subject to compulsory and binding arbitration before a System Board of Adjustment, leaving federal courts without jurisdiction. *Consol. Rail*, 491 U.S. at 303–04.

Carriers have a "relatively light burden" in establishing that a dispute is minor and therefore subject to mandatory arbitration. *Id.* at 307; *see also Bhd. of Maint. of Way Empls. v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 643 (7th Cir. 1997) ("For the union to prevail under the RLA, . . . the evidence must do more than tilt; it must slide into a heap on one side."). A dispute is minor if the carrier's interpretation "is arguably justified by the terms of the collective bargaining agreement." *Consol. Rail*, 491 U.S. at 307. "Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." *Id*. A carrier's claim is "insubstantial" if it would undermine the RLA's prohibitions against unilateral imposition of new contractual terms. *Id.* at 306 (citations omitted). In making its determination, the court must be careful not to consider the merits of the underlying dispute: "its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *Ry. Labor Execs. Ass'n v. Norfolk & W. Ry. Co.,* 833 F.2d 700, 704 (7th Cir. 1987).

**B.     Republic Agreement**

Republic maintains that the unilateral implementation of the Republic Agreement that offers captain upgrade and retention bonuses as a means of recruitment is within its

10

express contractual authority under Article 3.O of the 2022 Republic-IBT CBA. Therefore, Plaintiffs' claims raise only minor disputes subject to the exclusive jurisdiction of the System Board.  Plaintiffs first argue that Republic has no authority under the parties' CBA to enter into those agreements because Article 3.O.3 of the Republic-IBT CBA applies only to "Pilots," not "New Hire Pilots," as those terms are defined in the CBA.

>The provisions at issue provide:
>
>1.  With respect to signing bonuses, stipends and other new hire incentives, the Company has the discretion to offer, and to increase or decrease, signing bonuses, stipends, and/or incentives in its recruitment efforts of New Hire Pilots. The Company has the discretion to *determine the terms* of the signing bonus, stipend, and/or other incentives for New Hire Pilots *including but not limited to* the timing of payments of such signing bonuses, stipends, and/or incentives.
>. . .
>
>3.  The Company, in its discretion, may offer a bonus or financial incentive at any time *and of any type or form* to incentivize a qualified Pilot to complete Captain qualification training. The Company has the discretion to determine the terms of the bonuses, or other incentives for Pilots, *including but not limited to* the timing of payments of such bonuses and/or incentives.

(Republic-IBT CBA, Art. 3.O.1., 3.O.3 at 3-7) (emphasis added).

Collective bargaining agreements are "not ordinary contract[s]," but "generalized code[s] to govern a myriad of cases which the draftsmen cannot wholly anticipate." *Consol. Rail*, 491 U.S. at 311 (quoting *Transp.-Commc'n Emps. Union v. Union Pac. R.R. Co.*, 385 U.S. 157, 160–61 (1966)).  Therefore, in interpreting the parties' CBA, the court may "consider the scope of other related collective bargaining agreements, as well as

usage and custom pertaining to all such agreements." *Transp.-Commc'n Emps. Union,* 385 U.S. at 61.

The parties' previous 2018 CBA provided:

Signing Bonuses and New Hire Incentives

1. With respect to signing bonuses, stipends and other new hire incentives, the Company has the discretion to offer, and to increase or decrease, signing bonuses and/or incentives in its recruitment efforts of New Hire Pilots. The Company has the discretion regarding the timing of payments of such signing bonuses and/or incentives for New Hire FO Pilots.

2. The Company, in its discretion, may forgive or reimburse (directly or indirectly, in whole or in part, over any duration(s) defined by the Company) and loan(s) that were taken out by Pilots (or provided to the Pilot) to offset costs associated with any form of training, education and/or certification of becoming qualified to be a New Hire Pilot at the Company.

(Filing No. 25-3, 2018 Republic-IBT CBA, Art. 3.O.1, 3.O2 at 3-8, 3-9).

A comparison of the 2022 and 2018 Republic-IBT CBAs shows the expansion of Republic's discretion to "determine the terms" of the new hire incentives in three ways. First, the heading of the earlier version of Article 3.O does not include "Other Bonuses/Incentives." Second, the earlier version of Article 3.O.1 does not include the right of Republic to "determine the terms" of these incentives "including but not limited to" the timing of such incentive payments. Lastly, the earlier version does not include an Article 3.O.3 at all, most notably the right of Republic to offer incentives "at any time and of any type or form to incentivize a qualified Pilot." The broader language of Article 3.O in the 2022 CBA supports Republic's argument that it bargained for and obtained a right to offer a wide range of incentives to help with recruiting pilots.

With that background in mind, the court turns to the plain language of Article 3.O. Republic asserts that at the time Republic offers the Pre-Hire Agreement to pilot candidates, they have not been hired by Republic, so they are neither covered by the CBA nor represented by Plaintiffs. (*See generally* Republic-IBT CBA, Art. 1). Once they are hired, these pre-hire pilots become "New Hire Pilots" under the CBA, subject to Article 3.O.1. The broad discretionary language set forth in Article 3.O.1 does not limit what kinds of incentives can be offered as part of Republic's recruitment efforts.

Republic further asserts that Article 3.O.3 allows it to "offer a bonus or other financial incentive at any time and *of any type or form* to incentivize a qualified Pilot to complete Captain qualification training." (*Id.*, Art. 3.O.3 at 3-7) (emphasis added). While Article 3.O.3 applies to "qualified Pilots," Republic argues that term does not necessarily preclude Article 3.O.3's application to "New Hire Pilots," as the term "New Hire" is defined as "[a] Company employee newly hired as a *Pilot*." (*Id.*, Art. 2 ¶ 174 at 2-14) (emphasis added). Even if, as Plaintiffs contend, Republic's interpretation of Article 3.O.3 is wrong, Republic's reliance on Article 3.O is not frivolous or obviously insubstantial. *Nat'l Ry. Lab. Conf. v. Int'l Ass'n of Machinists & Aerospace Workers*, 830 F.2d 741, 749 (7th Cir. 1987) ("[T]he fact that a contract interpretation is questionable, and may be wrong, does not make it frivolous.").

Next, Plaintiffs argue the challenged employment agreement is prohibited because it directly conflicts with Article 9.F of the Republic-IBT CBA by imposing post-employment restrictions. Article 9.F provides, in part, that "[e]ach and every Pilot who separates from the Company under good terms, who is deemed eligible for rehire in his

13

employment separation file, and who the Company has designated as a preferential rehire shall be allowed to return to the Company" under specific conditions.  (Republic-IBT CBA, Art. 9.F at 9-5).  Contrary to Plaintiffs' argument, this article covers the conditions under which a pilot *returns* to Republic after leaving the Company on good terms; it does not address post-employment restrictions.  There is no clear conflict here.

      Lastly, Plaintiffs maintain that under Article 1.C.1 and 1.D of the Republic-IBT CBA, Republic cannot enter into other agreements governing the rates of pay, rules and working conditions of its pilots or rely on the silence in its CBA to justify its authority to enter into the Republic Pre-Hire Agreement.  Article 1.C.1. provides, in part: "This Agreement shall supersede all existing or previously executed Agreements by and between the Company and the Union or any other labor organization or individual with respect to the rates of pay, rules, or working conditions governing the employees covered by this Agreement . . . ."  (*Id.*, Art. 1.C.1 at 1-1).  The Republic Pre-Hire Agreement came after the CBA; therefore, this provision does not preclude the agreement.  Article 1.D. covers the scope of work, and provides, in part, that "[e]xcept as otherwise provided in this Agreement, all present and future Flying . . . shall be performed by Pilots on the Republic Airways Pilots' System Seniority List in accordance with the terms and conditions of this Agreement or any other applicable agreement . . . ."  (*Id*., Art. 1.D.2. at 1-2).  Article 1.D.2. protects the right of Republic pilots to fly Republic flights, which is not affected by the Republic Pre-Hire Agreement.  Even if there was a conflict, Article 1.D.2. is modified by the phrase: "[e]xcept as otherwise provided in this Agreement," which arguably includes Article 3.O.  (*Id*.).

For the reasons set forth above, the court finds Republic's Pre-Hire Agreement is not in direct conflict with any other provision of the Republic-IBT CBA and is arguably justified by Article 3.O. Accordingly, the present dispute is properly characterized as minor.

C.     **Pathway Pre-Hire Agreement**

Republic argues the Pathway Pre-Hire Agreement between a pilot candidate, Hyannis Air, and Republic is authorized by Article 3.O of the Republic-IBT CBA and the Management Rights Clause in the Hyannis Air-IBT CBA. The court will begin with Plaintiffs' arguments regarding Article 3.O of the Republic-IBT CBA.

Plaintiffs argue Article 3.O restricts its application to Republic pilots. That may be true, but nothing in the parties' CBA restricts Republic from contracting with a third party, such as a Hyannis Air pilot. Moreover, once the Hyannis Air pilot transitions to Republic, they become Republic employees subject to Article 3.O. The Pathway Agreement, which grants Republic broad discretion to offer employment bonuses and other incentives, is arguably justified by the terms of the Republic-IBT CBA.

Turning to the Hyannis Air-IBT CBA, Section 1.J of that document, entitled Management Rights, provides:

> The Company has and retains and the Union recognizes the sole and exclusive right of the Company to exercise all rights or functions of management except to the extent that such rights of management are limited by this Agreement and so long as the exercise of such rights does not conflict with the terms of this Agreement.

(Hyannis-IBT CBA, Section 1.J at 11). Thus, Hyannis Air's ability to implement the challenged agreement is circumscribed only "as limited by this Agreement" and where a

conflict with the terms of the CBA exists.  Here, Plaintiffs contend "the challenged agreement conflicts with a number of provisions in the Hyannis-Air CBT."  (Filing No. 33, Plfs' Resp. at 13).  The court disagrees.

First, Plaintiffs argue the agreement's bonus compensation directly conflicts with Section 3 of the Hyannis Air-IBT CBA, entitled Compensation.  Section 3 deals with issues like pay calculations, vacation pay, sick pay, overtime pay, reassignment pay, and cancellation pay.  (Hyannis Air-IBT CBA, Section 3 at 22–32).  Hyannis Air does not change the pilot's compensation under the terms of the Pathway Agreement.  Instead, while employed at Hyannis Air, the pilot receives either a monthly housing stipend or housing accommodations.  (Pathway Agreement at 2).  And Plaintiffs admit the CBA "contains no mention of bonuses or stipends paid to pilots."  (Pls.' Resp. at 14).  Therefore, the Pathway Agreement's bonus compensation does not *conflict* with the terms of the CBA.  *See Chi. & N.W. Transp. Co. v. Ry. Labor Execs.' Ass'n*, 908 F.2d 144, 155 (7th Cir. 1990) ("What the agreements do not expressly or impliedly forbid they permit.").

Second, Plaintiffs argue "the Pathway Agreement requires the affected Hyannis Air pilot to abandon his or her employment at Hyannis, including all seniority, longevity and other employee rights accrued at the carrier, to start over in employment at Republic Airways." (FAC ¶ 23).  They do not explain *how* the challenged agreement *conflicts* with the CBA though.  Anytime one leaves employment, one forfeits seniority; the Hyannis Air-IBT CBA provides as much.  (Hyannis Air-IBT CBA, Section 15.D. (explaining that a pilot who separates from the Company forfeits seniority rights)).

16

Third, apparently because a Hyannis Air pilot will need to "pick up incremental shifts above and beyond the standard flight assignment" to achieve a monthly flight schedule of 103 hours (Pathway Agreement at 1–2), Plaintiffs contend the pilot will be forced to waive certain contract provisions, such "work schedule bidding, days off, and leave entitlements," (FAC ¶ 39.a). They do not explain why this is so. The pilot may need to work extra shifts, but that, in and of itself, does not deprive the pilot from exercising his or her rights under the CBA.

Next, Plaintiffs argue the Pathway Agreement conflicts with Sections 1.D.1 and 1.E.1 of the Hyannis Air-IBT CBA. Section 1.D.1 generally provides that the CBA "shall supersede all existing or previously executed Agreements by and between the Company and the Union," while Section 1.E.1 provides that, "[e]xcept as provided elsewhere in this Agreement, . . . all revenue flying performed by or for or on behalf of the Company . . . shall be performed by Pilots on the Cape Air Seniority List[.]" (Hyannis-Air CBA, Section 1.D.1 & Section 1.E.1 at 2). Again, the Pathway Agreement was executed after the parties' CBA and does not conflict with these provisions. Accordingly, the Pathway Agreement is arguably justified by the terms of the Hyannis Air-IBT CBA.

Lastly, Plaintiffs argue that, during previous negotiations with IBT over retention bonuses, "Hyannis Air admitted to [IBT] that it required the union's agreement in order to pay bonuses to its pilots and that such bonuses were not otherwise authorized by the parties' collective bargaining agreement." (FAC ¶ 42). But pursuant to the terms of the Pathway Agreement, Hyannis Air does not pay its pilots a bonus; Republic pays their signing bonuses and the captain upgrade bonuses. (Pathway Agreement at 2).

17

While the Hyannis Air-IBT CBA does not expressly prohibit the Pathway Agreement, the agreement is also arguably justified under the Management Rights Clause of the Hyannis Air-IBT CBA.  As the Supreme Court observed, "[m]anagement hires and fires, pays and promotes, supervises and plans.  All these are part of its function, and absent a collective bargaining agreement, it may be exercised freely except as limited by public law[.]" *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 583 (1960).  The Management Rights Clause's expansive language arguably permits implementation of the Pathway Agreement without union involvement.  In other words, this dispute comes down to contract interpretation and is therefore minor.

### D.    Indiana State Law Claim

In Count IV, Plaintiffs also bring a state law claim alleging that the post-employment non-compete and liquidated damages provisions violate Indiana law on restrictive covenants.  The Seventh Circuit has held: "[W]here there is no underlying original federal subject matter jurisdiction, the court has no authority to adjudicate supplemental claims under § 1367." *Rivera v. Allstate Ins. Co.*, 913 F.3d 603, 618 (7th Cir. 2018) (quoting *Herman Fam. Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 805 (9th Cir. 2001)).  Because the court lacks subject matter jurisdiction over Counts I-III of the First Amended Complaint, the court may not exercise supplemental jurisdiction over this claim.

## IV.    Conclusion

The court lacks subject matter jurisdiction over Plaintiffs' Railway Labor Act claims set forth in Counts I-III of the First Amended Complaint and, given that

circumstance, it may not exercise supplemental jurisdiction over Plaintiffs' state law claim set forth in Count IV.  Accordingly, Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint is **GRANTED**.  Counts I-IV are **DISMISSED WITHOUT PREJUDICE**.  Final judgment shall issue by separate order.

**SO ORDERED** this 6th day of March 2024.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.